LAURA ROSSETTI,

                    Plaintiff,

v.                                                              Case No. 3:16-cv-1357-J-34JRK

THE ROSE GROUP, INC. d/b/a
Suwannee Medical Personnel,

                    Defendant.
_____/

## ORDER

**THIS CAUSE** is before the Court on Defendant The Rose Group, Inc. d/b/a

Suwannee Medical Personnel's Motion for Summary Judgment and Memorandum of Law

(Doc. 19; Motion), filed on March 23, 2018.  On April 9, 2018, Plaintiff Laura Rossetti filed

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and

Brief and Memorandum of Law in Support (Doc. 24; Response).  Accordingly, this matter

is ripe for review.

## I.      Background[1]

Rossetti brings this case against Defendant The Rose Group, Inc. d/b/a Suwannee

Medical Personnel (SMP) alleging violations of the Family and Medical Leave Act (FMLA),

29 U.S.C. § 2601 et seq.  See generally Complaint with Demand for Jury Trial (Doc. 1;

---

[1]      For the purposes of resolving Defendant's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Plaintiff.  However, the Court notes that these facts may differ from those ultimately proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

Complaint).  Specifically, Rossetti asserts an FMLA retaliation claim (Count I) and a claim for interference with her rights under the FMLA (Count II).  Id. ¶¶ 24-37.

**A.  Rossetti's Employment**

SMP is a supplemental nurse staffing company with five locations.  See Deposition of Fred Rogers (Doc. 24-2; Rogers Dep.) at 12.[2]  In August 2008, Fred Rogers, SMP's Vice President, hired Rossetti to work as the Branch Manager of SMP's Jacksonville location.  See Deposition of Laura Rossetti (Doc. 19-1; Rossetti Dep.) at 11-12[3]; Rogers Dep. at 9; Affidavit of Fred Rogers (Doc. 19-4; Rogers Aff.) ¶ 3.  Rogers served as Rossetti's direct supervisor, although he was only present at SMP's Jacksonville location one or two days per week.  See Rogers Dep. at 13; Rogers Aff. ¶ 4.  As the Jacksonville Branch Manager, Rossetti worked from 8:30am to 5:00pm.  See Rossetti Dep. at 51; Rogers Dep. at 39.  Her duties included customer service, hiring the temporary staff, orienting new employees, and marketing.  See Rogers Dep. at 11.  Rossetti was also responsible for the financial performance of the branch.  Id. at 11-12.

SMP sets forth its policies in an employee handbook.  See Employee Handbook Excerpt (Doc. 19-3; Handbook).  Rossetti reviewed the Handbook "[u]pon hire."  See Rossetti Dep. at 12-13, 50.  In relevant part, the Handbook provides that employees may not use the Internet "for personal matters, private business, or entertainment," access inappropriate websites, send personal e-mails, and receive visitors during work hours.  See Handbook at 28, 34.  The Handbook further provides that a "slow-down, interference or delay o[f] your work or of the work of other employees" is "improper conduct."  See

---

[2]     The exhibits attached to the Rogers Dep. have been filed as Document 31 on the record.

[3]     The exhibits to the Rossetti Dep. have been filed as Document 32 on the record.

Handbook at 52. According to the Handbook, "if any employee engages in activity detrimental to the best interests of [SMP], [SMP's] patients/clients or [SMP's] employees, then he or she will receive appropriate discipline. Discipline may include a verbal or written correction notice, suspension, or discharge." Id. All disciplinary decisions are made by management "depending upon the frequency and the nature of offense." Id. at 53; see also Rogers Dep. at 38 (noting that SMP "believe[s] in progressive discipline" which varies "based on the severity of the issue").

The Handbook also provides for performance reviews. Specifically, the Handbook states that a supervisor should review his employee's performance "after the completion of the ninety (90) calendar day introductory period, and then annually on [her] anniversary date . . . ." See Rogers Dep. at 18. On January 6, 2011, Rogers reviewed Rossetti's performance. See Rogers Dep., Ex. 2: Personnel Performance Appraisal Form ("2011 Review").[4] Rogers rated her a four out of five with respect to cooperation/attitude, quality, quantity, and job knowledge, and a three out of five with respect to dependability, initiative, and organization. Id. at 2-4. Overall, Rogers rated her a four out of five. Id. at 5. Although Rogers recalls reviewing Rossetti at other points during her employment, SMP does not have a record of such reviews. See Rogers Dep. at 18-19.

The parties dispute the degree to which SMP enforces the policies in its Handbook. For example, Rossetti denies that SMP prohibits employees from engaging in excessive personal phone calls, using the Internet for personal purposes, and receiving visitors at

---

[4]    Rogers refers to Rossetti as "Lori Moore" on the 2011 Review. See 2011 Review at 1; Rogers Dep. at 20. Rossetti appears to utilize the nickname "Lori" and previously had the last name of Moore. See Rossetti Dep. at 77-78. Her current legal name is Laura Walker. See Affidavit of Laura Walker (Doc. 24-3; Rossetti Aff.) ¶ 3. Because she was known by the name Rossetti while employed with SMP, to avoid confusion, the Court will refer to her as Rossetti in this Order.

work.  See Rossetti Dep. at 51-53.  In Rossetti's view, SMP "didn't really care" about excessive personal calls in the workplace because "[w]e all had our cell phones."  See Rossetti Dep. at 51.  In contrast, Rogers maintains that SMP permits employees to take "limited personal calls during work hours" for "urgent issues" only and determines whether to allow an employee to use its computers for personal purposes on a "case-by-case" basis.  See Rogers Dep. at 43, 45.  However, he acknowledges that employees are permitted to check social media during scheduled breaks.  Id. at 45-46.

**B. Rossetti's Performance**

In May of 2016, Rogers "was advised that [Rossetti] started exhibiting performance issues at work."  See Rogers Aff. ¶ 5.  Specifically, Rogers heard concerns from two of Rossetti's workmates: Michelle Wirth, "a staffing coordinator" and Rossetti's part-time "helper," and Diane Kelly, the director of SMP's "home care business."  See id. ¶ 6; Rogers Dep. at 13-14.  Wirth reported to Rogers that Rossetti was "leaving early, taking long lunches and having long personal phone conversations while on the job."  See Rogers Aff. ¶ 7.  Kelly informed Rogers that Rossetti was "spending an excessive amount of time with Dr. Simpson . . . while at work on personal matters."  Id. ¶ 8.[5]  In response to these concerns, and because he was not in the Jacksonville office on a regular basis, in June or July of 2016, Rogers asked Wirth to keep a log documenting: "when [Rossetti] comes

---

[5]        Simpson is a "family counselor/support counselor" who had an office adjacent to SMP's office suite. See Rogers Dep. at 35.  He is also a former member of the advisory board for SMP's home care business. Id.  As a courtesy, SMP allowed Simpson to come over to its office suite and use its copy machine.  Id. at 35-37.  At some point, Rogers spoke with Simpson about not bothering or interrupting Rossetti at work, and Simpson agreed to comply with this request.  Id. at 36-37.  Rogers also maintains that he counseled Rossetti about the time she spent with Simpson at work.  See Rogers Aff. ¶¶ 10-11, Exs. A, B.  Rossetti denies that she was ever counseled about Simpson, but concedes that Rogers told her he was going to talk to Simpson, advised her of his conversations with Simpson, and copied her on an email to Simpson informing him that he was not allowed to come into SMP's office anymore.  See Rossetti Dep. at 26-27.

in, when she leaves, coming back and forth into the office and for what reason, if [Rossetti] mentioned it, and how many times she received personal phone calls, particularly from her boyfriend, and if Dr. Simpson came over, how much time he spent with her." <u>See</u> Rogers Dep. at 53-54; <u>see</u> <u>also</u> Rogers Aff. ¶ 13.  Wirth kept this log as instructed from July 19, 2016, through August 22, 2016.  <u>See</u> Affidavit of Michelle Wirth (Doc. 19-7; Wirth Aff.) ¶ 12, Ex. B: Wirth Log.

The Wirth Log reflects that Rossetti regularly engaged in personal phone calls, routinely took breaks, and frequently left work early.  <u>See</u> <u>generally</u> Wirth Log; Wirth Aff. ¶¶ 4-10.  Rogers kept the Wirth Log in his office and reviewed it periodically.  <u>See</u> Rogers Dep. at 54.  The Wirth Log does not document every work day between July 19th and August 22nd, but of the thirteen days included in the Wirth Log, Wirth notes six occasions where Rossetti left work early with no explanation (in addition to leaving early once because she did not feel well, once "to go to stadium" and once to "[take] Diana computer,") and two occasions where she arrived at work late.  The most egregious example of Rossetti's untimeliness occurred on August 4th when Rossetti arrived at 9:40 a.m. and left at 4:34 p.m.  <u>See</u> Wirth Log at 3.  The Wirth Log also reflects that Rossetti took periodic ten to fifteen-minute breaks, as well as occasional ten to fifteen-minute phone calls.  <u>Id.</u>[6]  Notably, Rossetti generally denies that she took excessive personal calls or excessive breaks, <u>see</u> Affidavit of Laura Walker (Doc. 24-3; Rossetti Aff.) ¶ 10,

---

[6]    Rossetti disputes the accuracy of the Wirth Log as to her phone calls and argues that at least three of the phone calls documented on the Wirth Log are contradicted by her personal cell phone records.  <u>See</u> Rossetti Aff. ¶ 12, Ex. C.  Even so, several of the calls noted on the Wirth Log are consistent with Rossetti's phone records, such as a fifteen-minute call on July 19th, a nine-minute call on July 21st, a ten-minute call on July 22nd, and a twenty-five-minute call on August 22nd, among others.  <u>Compare</u> Wirth Log <u>with</u> Rossetti Aff., Ex. C.  However, even if the Wirth Log is inaccurate, Rogers did not have access to Rossetti's personal cell phone records, and thus, would not have known that the Wirth Log did not accurately reflect Rossetti's activities at work.

and maintains that she was never counseled or disciplined about her workplace conduct.[7]
Id. ¶ 6; Rossetti Dep. at 81.  Nevertheless, she does not dispute that Rogers asked Wirth
to keep the Log of her activities.  See Response at 4.  In his deposition, Rogers testified
that in his opinion, Rossetti's conduct as reflected in the Wirth Log was not sufficient to
warrant Rossetti's termination at that time.  See Rogers Dep. at 56-58.

### C. Rossetti's Termination

On August 22, 2016, Rossetti left work early due to a headache.  See Rossetti
Dep. at 15.  When her symptoms worsened the next morning, she had her cousin call
Kelly to advise that she would not be going to work.  Id. at 15-16.  The following day,
August 24, 2016, Rossetti was admitted to the hospital with a subarachnoid hemorrhage
(brain aneurysm).  See Rossetti Aff. ¶ 15.  Rossetti notified Kelly of her hospitalization
and diagnosis that same day, and informed her that she would be having emergency
surgery and expected an extended hospital stay.  Id. ¶ 16.  On August 26, 2016, Kelly
called Rogers to let him know that Rossetti had been hospitalized.  See Rogers Dep. at
22; Rogers Aff. ¶ 15.  SMP placed Rossetti on paid leave and did not count her absences
against her while she was hospitalized.  See Rogers Aff. ¶ 16; Rossetti Dep. at 20.  On
September 1, 2016, Rossetti unsuccessfully attempted to access her work e-mails from

---

[7]     According to Rogers, he verbally counseled Rossetti in June of 2016 on three occasions: once
about her excessive personal calls, and twice about her conversations with Dr. Simpson.  See Rogers Aff.
¶ 10.  In support, Rogers submits two memoranda, signed by him and dated June 2 and June 16, 2016,
summarizing the conversations he purportedly had with Rossetti.  Id., Exs. A and B.  Rossetti denies that
she was ever counseled about excessive phone calls, Dr. Simpson, or any other issues in the workplace.
See Rossetti Aff. ¶ 6; Rossetti Dep. at 26, 55, 81.  In support, Rossetti presents a text message she received
from Rogers on June 2, 2016, which establishes that Rogers was out of town on that date, contradicting
his assertion that he counseled Rossetti in person that day.  Compare Rogers Aff. ¶ 10, Ex. A with Rossetti
Aff. ¶ 7, Ex. A.  Because the Court views the evidence in the light most favorable to Rossetti, the Court will
accept Rossetti's representation that she was never counseled about her workplace conduct.  The Court
notes that Rossetti also relies on this text as evidence of Rogers "praising" her for her work, as she states:
"We're on a great run in Jack's thanks to you."  See Rossetti Aff. ¶ 7, Ex. A.  Although, Rogers followed this
compliment with the caveat: "But we want to make that the norm so that takes dedication every day."  Id.

the hospital.  See Rossetti Dep. at 21.  On September 5, 2016, Rogers visited Rossetti at the hospital, see Rossetti Aff. ¶ 18; Rossetti Dep. at 21-22, and explained that he temporarily blocked her from accessing the SMP database so that she could focus on getting well.  See Rossetti Dep. at 22.

During Rossetti's leave, both Wirth and Kelly separately approached Rogers to report additional allegations of Rossetti's workplace misconduct.  See Rogers Dep. at 44-45; see also Rogers Aff. ¶ 17 ("During [Rossetti's] leave, I was advised by both Wirth and Kelly that [Rossetti's] violations of workplace policies and work performance issues were much more significant and frequent than I was previously aware of . . . .").  Specifically, Kelly informed Rogers that Rossetti was "not performing as a branch manager, that she witnessed her for several months apparently playing games on her computer, [and] sharing inappropriate photos for the workplace off of her computer."  See Rogers Dep. at 44-45.  Rogers received a similar report from Wirth who added that Rossetti "would watch Netflix during work hours," and "would not accept calls from staff wanting to work . . . ."  Id. at 45.  Indeed, following the August 22nd entry, on the last page of the Wirth Log, Wirth reports:

Things Done @ Work

1) Facebook all the time
2) Playing games on computer
3) Calling about Billy's things like where to send visiting request, when he was going to be moved, about points on drivers lics, pulling up all his jail records, taking care of Child Support stuff for him
4) Printing out pictures to send to him
5) Watches Netflix (movies)

See Wirth Log.[8]

---

[8]     Rossetti relies on this page of the Wirth Log to argue that Rogers was aware of all of Rossetti's alleged workplace misconduct prior to her hospitalization and did not think it enough for termination.  See

Rogers' account of the reports he received from Wirth and Kelly is consistent with the conduct described in the sworn Affidavits of those two employees. Specifically, Kelly asserts that during the work day she saw Rossetti: engage in personal phone calls with her boyfriend and others, come in late and leave early, play card games on her work computer, take frequent breaks, leave the office to run personal errands, spend time working for and talking to Simpson, and "show off pictures that were stored on SMP's computers and printed using SMP's office equipment of her boyfriend (Billy L.N.U.) not fully clothed." See generally Affidavit of Diane Kelly (Doc. 19-5; Kelly Aff.).[9] Similarly, in her Affidavit, Wirth reports that she has observed Rossetti: "watch Netflix on SMP's computer," "use SMP's computer to play games," receive telephone calls from her boyfriend that interfered with her work, visit with Simpson for hours and perform work for him, use SMP's computer and printer to print pictures of herself, including a picture posing "only in her under clothes," to send to her boyfriend while he was incarcerated, upload pictures of her boyfriend to her work computer and print them out using SMP's printer, and leave work for hours at a time. See generally Wirth Aff. Based on the information

_____

Response at 4, 6. However, the list of misconduct occurs on the last page of the Wirth Log, after the final daily entry on August 22, 2016. Wirth does not indicate elsewhere in the Wirth Log that Rossetti was playing games, spending time on Facebook, watching movies on Netflix, printing personal photos, or the details of her calls with her boyfriend. As such, the Wirth Log does not support Rossetti's contention that Rogers was aware of these accusations prior to her hospitalization on August 24, 2016. Rogers testified that it was after Rossetti was hospitalized that he learned "more about the other incidents regarding the hair dying, the Netflix, the frequent visits and phone calls from her boyfriend." See Rogers Dep. at 55, 57 Likewise, it was after Rossetti was hospitalized that Wirth and Kelly complained to Rogers about Rossetti's inappropriate photographs on her work computer. Id. at 46.

[9]       Kelly also reports that in March of 2014, she saw a former employee of SMP "dying Ms. Rossetti's Hair during work hours." See Kelly Aff. ¶ 5. Rogers testified that Kelly reported this incident to him after Rossetti's hospitalization. See Rogers Dep. at 50-51. According to Rogers, he "absolutely [did] not" give Rossetti permission to dye her hair on the company property, id. at 51, but Rossetti maintains that Rogers did give her permission to color her hair at work, see Rossetti Dep. at 79. Accordingly, viewing the facts in the light most favorable to Rossetti, the Court will assume that Rossetti had permission to dye her hair at work in 2014.

Wirth and Kelly disclosed after Rossetti's hospitalization, Rogers decided to search Rossetti's computer. See Rogers Dep. at 43-44. He confirmed that Facebook and Netflix had been installed on Rossetti's work computer, and that Rossetti had "stored personal and inappropriate pictures on her work computer all in clear violation of company policy." See Rogers. Aff. ¶ 20; see also Rogers Dep. at 46-49.

Rossetti denies any wrongdoing. She asserts that her personal photos ended up on SMP's computer because her iCloud account was synced with the computer in order to upload holiday photos to SMP's Facebook page, and automatically uploaded those other photos. See Rossetti Dep. at 63-65. She denies that she "played card games on [her] computer, watched Netflix, used Facebook, took excessive personal calls, or took excessive breaks." See Rossetti Aff. ¶ 10. She explains that Netflix was present on her work computer because the computer used the Windows 8 operating system and "Netflix is already downloaded and automatically included on any computer operating using Windows 8." Id. ¶ 14. In addition, Rossetti disputes that she used Facebook inappropriately, and maintains that Rogers encouraged her to use Facebook to find staff. See Rossetti Dep. at 55-56. Rossetti does not deny that she printed her personal photographs at work, but maintains that she used her own paper and ink to do so. See Rossetti Dep. at 56.[10]

Rossetti was discharged from the hospital on September 6, 2016. See Rossetti Aff. ¶ 19. A few days later, she contacted Rogers to tell him that she was ready to return

---

[10]    Although Rossetti also asserts that Rogers gave her permission to print photos, her testimony indicates that this permission pertained to work photos. Id. at 56. Specifically, she explained, "we had to print photos for special occasions, Christmases, parties. If we took pictures [Rogers] wanted us to do bulletins, post them in the office, employee of the month, . . . ." Id. Any such permission would not extend to uploading and printing pictures of herself in her underclothes to send to her boyfriend, which is the conduct Wirth reported to Rogers. See Wirth Aff. ¶ 10; Rogers Aff. ¶ 19; see also Motion, Ex. 6.

to work.  Id.  During this phone call, Rogers advised Rossetti that SMP was eliminating her position and that she would receive a letter in the mail.  See Rossetti Dep. at 38-39, 42; Rogers Dep. at 24, 39-40, 60.  Rossetti received an official Termination Letter (Doc. 19-11) in the mail confirming that SMP eliminated her position and would not offer her an alternative position due to performance issues including but not limited to:

- Excessive time spent on personal matters while in the office, in front of other Suwanne employees and while on company time (you had been counseled officially no less than 2 times formally about this specific issue).

- Excessive amount of personal phone calls taken at any time during business hours often times interfering with company business (personally witnessed by me and documented by Suwanee staff).

- Excessive use of games, facebook, Netflix, while in the office and on company computers and company time as witnessed by other Suwannee staff.

- Inappropriate use of company computers.  Excessive personal photos on multiple office PC's, to include inappropriate personal photo of you in undergarment displaying a tattoo.

- Constantly leaving the office before 5pm as witnessed and documented by other Suwannee staff.  I counseled you on leaving work before 5 for reasons unrelated work multiple times.

- Multiple complaints by clients that you personally are hard to contact and do not "get back" to them.  [sic].

See Termination Letter.  SMP also sent Rossetti two Separation Notices, both dated September 9, 2016, and signed by Rogers, one of which stated that her termination was due to "Substandard Performance" and "Violation of Company Policy," and the other of which stated that she was terminated as a result of "Job elimination."  See Rossetti Aff. ¶ 19, Ex. D.

**D. Instant Action**

Rossetti commenced this action by filing the Complaint on October 28, 2016.  <u>See generally</u> Complaint.  In the Complaint, she sets forth two claims under the FMLA for retaliation (Count I) and interference (Count II).  <u>Id.</u> ¶¶ 24-37.  Specifically, Rossetti alleges that SMP interfered with her substantive rights under the FMLA by failing to comply with the FMLA's notice requirements, and that SMP retaliated against her for attempting to exercise her FMLA rights by terminating her employment.  <u>Id.</u> ¶¶ 2, 16, 20-21, 28, 35.  SMP filed its Answer and Affirmative Defenses (Doc. 10) on February 16, 2017.

In the instant Motion, SMP seeks entry of summary judgment in its favor on both counts.  <u>See generally</u> Motion.  SMP's primary argument is that it terminated Rossetti for legitimate reasons unrelated to any of her attempts to exercise her FMLA rights.  <u>Id.</u> at 14-21.  As such, SMP contends that both of Rossetti's claims fail.  <u>Id.</u>  However, Rossetti contends that there is a genuine dispute of material fact as to whether SMP's reasons for her termination are pretextual, which precludes entry of summary judgment.  <u>See</u> Response at 12-14.

**II. Standard of Review**

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials." Rule 56(c)(1)(A).[11] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of

---

[11]     Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.    Discussion

"The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons, including '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)) (alteration in Hurlbert). "The FMLA provides that leave for a serious health condition need not be taken as a 12 week block but rather may be taken 'intermittently or on a reduced leave schedule when medically necessary.'" Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1204 n.4 (11th Cir. 2001) (quoting 29 U.S.C. § 2612(b)(1)). In addition, the FMLA grants an eligible employee who takes leave under the FMLA the right, upon returning from such leave, "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position. 29 U.S.C. § 2614(a)(1). In recognition of these rights, the FMLA further "creates a private right of action to seek equitable relief and money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights." Hurlbert, 439 F.3d at 1293 (quotation omitted). The Eleventh Circuit Court of Appeals has recognized

two types of claims arising under the FMLA: "'interference claims, in which an employee asserts that [her] employer denied or otherwise interfered with [her] substantive rights under the Act, and retaliation claims, in which an employee asserts that [her] employer discriminated against [her] because [s]he engaged in activity protected by the Act.'" Id. (citation omitted). Rossetti asserts both types of claims in this action. The Court turns first to her retaliation claim.

## A. Retaliation (Count I)

"[T]o succeed on a retaliation claim, an employee must demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." Strickland, 239 F.3d at 1207. "Essentially, [Rossetti] must show that she suffered an adverse employment action that was 'motivated by an impermissible retaliatory or discriminatory animus.'" See Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1243 (11th Cir. 2010) (quoting Strickland, 239 F.3d at 1207). When a plaintiff asserts a claim of retaliation under the FMLA based on a single-motive theory and relying on circumstantial evidence, as in this case,[12] courts apply the same burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for Title VII discrimination claims. See Schaaf, 602 F.3d at 1243; see also Bartels v. So. Motors of Savannah, Inc., 681 F. App'x 834, 837 (11th Cir. 2017).[13]

---

[12]     Rossetti does not argue that she has direct evidence of unlawful intent, nor does she contend that SMP had mixed-motives in terminating her employment. See Response at 6 (asserting that her termination was "clearly in retaliation for her used [sic] of medical leave"); id. at 12 (relying on the McDonnell Douglas framework).

[13]     "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Under this framework, "[a] prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two." Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234 (11th Cir. 2010). "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" Id. (quoting Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000)). Once an employee establishes a prima facie case of retaliation, "the burden shifts to the employer 'to articulate a legitimate reason for the adverse action.'" Martin v. Brevard Cnty. Pub. Sch., 543 F.3d 1261, 1268 (11th Cir. 2008) (per curiam) (quoting Hurlbert, 439 F.3d at 1297). "If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Id. (quoting Hurlbert, 439 F.3d at 1298).

The Court will assume, without deciding, that Rossetti has established a prima facie case of retaliation under the FMLA. See Schaaf, 602 F.3d at 1243 ("For the purposes of this analysis, this Court will assume without deciding that Schaaf has successfully established a prima facie case for FMLA retaliation."). Thus, turning to the second step of the McDonnell Douglas burden-shifting framework, the Court considers whether SMP has articulated legitimate, non-retaliatory reasons for terminating Rossetti. To satisfy its burden, SMP asserts that it eliminated Rossetti's position as the Jacksonville Branch Manager because "business had slowed" and "the office was operating sufficiently" despite Rossetti's performance issues, "evidencing the lack of need for

Plaintiff's position." See Rogers Aff. ¶ 22. In addition, SMP explains that it decided not to offer Rossetti an alternative position because of her various performance issues and SMP policy violations. See id. ¶ 23; see also Termination Letter. These grounds would constitute legitimate, non-retaliatory reasons for an employee's termination. See Benz v. Crowley Maritime Corp., 732 F. App'x 794, 801-02 (11th Cir. 2018) (finding employer's efforts to reduce costs and employee's poor job performance are legitimate, non-discriminatory reasons for termination); Ehrhardt v. Haddad Rest. Grp., Inc., 443 F. App'x 452, 456 (11th Cir. 2011) (recognizing that an employer may legitimately eliminate a position based on economic considerations); McCoy v. GEICO Gen. Ins. Co., 510 F. Supp. 2d 739, 752 (M.D. Fla. 2007) (noting that an employer may terminate an employee for company policy violations). Thus, the burden returns to Rossetti to show that SMP's proffered reasons are pretextual and that the true reason is unlawful retaliation. See Schaaf, 602 F.3d at 1244 & n.3.

"[T]o avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." Chapman v. AI Transport, 229 F.3d 1012, 1037 (11th Cir. 2000). Indeed, so long as the reason proffered by the employer is one that might motivate a reasonable employer, an employee "must meet that reason head on and rebut it." Raspanti v. Four Amigos Travel, Inc., 266 F. App'x 820, 824 (11th Cir. 2008) (quoting Chapman, 229 F.3d at 1030). "It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for [the adverse action] was pretextual." Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1278 (11th Cir. 2008) (citing Chapman, 229

F.3d at 1024-25).   Thus, the plaintiff "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (per curiam) (quotation omitted).   Nevertheless, the Court does not sit "as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive."   Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting Chapman, 229 F.3d at 1030).

In evaluating an employee's proof of pretext, the Supreme Court has instructed that "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."   See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (emphasis and alteration in original). Nevertheless, disproving an employer's explanation may give rise to a permissible inference that the employer intentionally retaliated against an employee because dishonesty about a material fact may be "affirmative evidence of guilt" or render retaliation the most likely alternative explanation for the employer's action.   See id.; see also Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1293 (D.C. Cir. 1998) ("If the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination.").   On the other hand, an employer would be entitled to summary judgment "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and

uncontroverted evidence that no discrimination had occurred."[14] <u>Reeves</u>, 530 U.S. at 148 (citing <u>Aka</u>, 156 F.3d at 1291-92).

Preliminarily, the Court notes that while close temporal proximity "is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection,'" for purposes of determining whether a plaintiff has established a prima facie case, it is "probably insufficient to establish pretext by itself." <u>Hurlbert</u>, 439 F.3d at 1298 (quotations omitted); <u>see</u> <u>also</u> <u>Daugherty v. Mikart, Inc.</u>, 205 F. App'x 826, 827 (11th Cir. 2006) (per curiam) ("The passage of a short amount of time between the plaintiff's request for leave and [her] termination may not be sufficient, by itself, to establish pretext."). Here, the Court finds that temporal proximity is insufficient to create a question of fact as to pretext because the intervening circumstances diminish any inference of causation that may have arisen out of the timing of Rossetti's termination. <u>See</u> <u>Henderson v. FedEx Express</u>, 442 F. App'x 502, 506-07 (11th Cir. 2011) ("Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action."); <u>Marx v. Baker Cnty. Med. Servs., Inc.</u>, No. 3:16-cv-462-J-32MCR, 2018 WL 4215950, at *7-9 (M.D. Fla. Sept. 5, 2018); <u>Wu v. Se.-Atl. Beverage Corp.</u>, 321 F. Supp. 2d 1317, 1337 (N.D. Ga. Jan. 23, 2004) ("[A]ny inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established.") (collecting cases). Rogers testified that both Wirth and Kelly separately approached him <u>after</u> Rossetti was hospitalized to relay <u>new</u> information regarding the extent of Rossetti's misconduct. <u>See</u> Rogers Dep. at 44-45. For example, Rogers

---

[14] Although the <u>Reeves</u> decision analyzed the denial of an employer's motion for judgment as a matter of law under Rule 50, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law such that 'the inquiry under each is the same.'" <u>Reeves</u>, 530 U.S. at 150 (quoting <u>Anderson</u>, 477 U.S. at 250-51).

testified that it was only after Rossetti's hospitalization that he was told she was watching Netflix during work hours, as well as uploading and printing inappropriate photographs on her work computer.  See id. at 44, 46, 55, 57.  Although Rogers had been aware from the day-to-day account set forth in the Wirth Log that Rossetti routinely took breaks, had frequent, but relatively short, personal phone calls, and a habit of leaving early, prior to August 22, 2016, the Wirth Log does not advise him of concerns regarding her use of Netflix, inappropriate photographs, or any of the other egregious acts of misconduct later reported by Wirth and Kelly.[15]  Indeed, the allegations in the Wirth and Kelly Affidavits, which are recounted in Rogers' Affidavit, are far more egregious than the shirking-off depicted in the Wirth Log.  Thus, while Rogers' decision to terminate Rossetti the day she called to return to work could be, at first blush, concerning, the intervening reports from Wirth and Kelly undermine the significance of the temporal proximity between her leave and the decision to terminate her employment.  See Hollan v. Web.com Grp., Inc., No. 1:14-CV-00426-LMM, 2015 WL 11237033, at *7 (N.D. Ga. July 1, 2015) ("An employer can fire an employee returning from FMLA leave if it discovers legitimate grounds for the termination while the employee is on leave.  The statute is not intended to protect an employee who chooses to go on leave from adverse employment action due to past professional digressions." (internal citation omitted)); Simpson v. Office of the Chief Judge of the Circuit Court of Will Cnty., 559 F.3d 706, 714 (7th Cir. 2009); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002) (finding temporal proximity did not support

---

[15]     As previously noted, Rossetti argues that the Wirth Log establishes that Rogers was aware of all these issues prior to her hospitalization because there was a list of these activities at the end of the Wirth Log, but this argument is not supported by the timeline of the events surrounding the Wirth Log and Rossetti's hospitalization.  See supra note 8.

inference of pretext because it was while the employee was on leave that employer discovered the extent of her wrongdoing); see also Schaaf, 602 F.3d at 1244-45.

The Court acknowledges that Rossetti denies engaging in any of the improper conduct set forth in the Termination Letter. However, even accepting that Rossetti did not engage in the misconduct of which she is accused, this does not establish pretext under the circumstances of this case. The Court's "inquiry is limited to whether the employer reasonably believed in good faith that the employee had engaged in misconduct, not whether the employee actually did so." See Leach v. State Farm Mut. Auto. Ins. Co., 431 F. App'x 771, 777 (11th Cir. 2011). Moreover, "[i]t is a well-settled principle of employment law that in investigating employee misconduct and reaching an employment decision, employers are entitled to make credibility decisions . . . ." Id. Here, Rogers received separate reports from two of Rossetti's co-workers relating similar concerns of Rossetti's misconduct in the workplace. Rogers partly corroborated those reports by searching Rossetti's work computer and discovering that, consistent with Wirth and Kelly's reports, both Netflix and personal photographs were present on her computer. While Rossetti has come forward with purportedly innocent explanations for why those items were on her computer, there is no evidence that Rogers had reason to know of these justifications when he made the termination decision.[16] As such, Rossetti's

---

[16] For example, during her deposition, Rossetti maintains that her personal pictures were stored in her iCloud account, which was accessible from her computer, but not actually downloaded to the computer itself. See Rossetti Dep. at 63-65. However, she later hedges this testimony by stating that she cannot "guarantee" that the pictures were not saved on her computer, but adds that if they were saved on her computer, then they had been there "for a very long time, which Fred Rogers, I'm sure, was aware of it." See Rossetti Dep. at 66-67. She offers no explanation for why or how Rogers would have been aware of the personal pictures saved on Rossetti's computer and her mere speculation alone is not sufficient to create a genuine issue of fact. See Cordoba v. Dillard's Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact." (internal quotation omitted)).

testimony that she did not do the things of which she is accused does not rebut Rogers' testimony that he in good faith believed that she did, and his decision to terminate Rossetti based on these reports is not unlawful simply because he may have been mistaken.  See Daugherty, 205 F. App'x at 827 ("[A]n employer may fire an employee based upon erroneous facts, as long as it is not for a discriminatory reason."); see also Leach, 431 F. App'x at 777; Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

In addition to the temporal proximity, Rossetti argues that she can establish pretext based on:

> (1) Defendant's constantly shifting pretextual explanations as to why Plaintiff was terminated, (2) the fact that Plaintiff never received a single formal "Corrective Action" write-up during her eight year tenure with SMP, coupled with the fact that (3) Defendant failed to follow its own internal progressive disciplinary policy when terminating a long term employee, like Plaintiff, who (4) had received positive performance reviews and (5) had never been warned that any of her alleged behaviors could lead to her termination.

Id. at 14.  Upon review, however, the Court finds these arguments to be unavailing.

Contrary to Rossetti's characterization, the record does not contain evidence that SMP gave "constantly shifting pretextual explanations as to why [she] was terminated." Id.  Rogers told Rossetti on the phone that SMP was eliminating her position.[17]  See Rossetti Aff. ¶ 19.  He then sent her a Termination Letter which reiterated this explanation and further provided that she would not be offered an alternate position due to her behavior and performance issues.  See Termination Letter.  The misconduct set forth in the Termination Letter is the same misconduct Rogers discusses in this litigation and recounted in the Wirth and Kelly Affidavits.  Rossetti received two Separation Notice forms

---

[17]     The Court notes that Rossetti provides no evidence, nor does she otherwise argue, that SMP did not in fact eliminate the Branch Manager position, as she was told, based on a downturn in the economy.

which repeated those reasons.  <u>See</u> Separation Notices.  Merely because SMP offered two reasons for its termination decision does not demonstrate "shifting justifications."  <u>See Vira v. Crowley Liner Servs., Inc.</u>, 723 F. App'x 888, 895 (11th Cir. 2018); <u>Mooren v. Sys. Studies & Simulation, Inc.</u>, No. 5:12-cv-00230-AKK, 2017 WL 3581727, at *4 (N.D. Ala. Aug. 18, 2017) ("Because multiple reasons may form the basis for an employer's decision, and, in fact, the law recognizes that an employer can cite multiple reasons, [the employer's] citation of these two reasons does not support [plaintiff's] contention of shifting rationales." (internal citation omitted)).  Significantly, SMP has consistently relied on these same two reasons both at the time of Rossetti's termination and throughout this litigation, and the two reasons support, rather than contradict, each other.  As such, SMP's reliance on two justifications for Rossetti's termination is not indicative of pretext.  <u>See Ritchie v. Indus. Steel, Inc.</u>, 426 F. App'x 867, 872 (11th Cir. 2011) ("[T]he fact that the employer offers an additional reason for the employment decision does not suggest pretext if both of the employer's reasons are consistent.").

In addition, the Court is not persuaded that Rossetti's positive performance review constitutes evidence of pretext.  <u>See</u> Response at 14.  In 2011, Rogers rated Rossetti a four out of five in the categories of cooperation/attitude, quality, quantity, and job knowledge, a three out of five in the categories of dependability, initiative, and organization, and gave her an overall score of four out of five.  <u>See</u> 2011 Review at 2-5.  However, Rogers testified that it was only in May of 2016 that the problems with Rossetti's job performance first arose.  <u>See</u> Rogers Aff. ¶ 5.  Thus, a positive review from five years earlier in 2011 sheds little light on whether Rogers believed that Rossetti had begun to shirk her work responsibilities in the last three months of her employment.  <u>See Walker v.</u>

St. Joseph's/Candler Health Sys., Inc., 506 F. App'x 886, 889 (11th Cir. 2013) (per curiam) (finding that a positive review "given before the complaints relied upon for [a] demotion began" are unhelpful in demonstrating pretext, and regardless the court "does not sit as a 'super-personnel department,' second-guessing whether [a] demotion was prudent." (quoting Alvarez, 610 F.3d at 1266)); Dingman v. Delta Health Grp., Inc., 26 F. Supp. 2d 1349, 1353 (S.D. Fla. 1998) (determining that positive evaluations "are not necessarily probative on the issue of pretext or on the validity of [an employer]'s subsequent problems with [an employee], including at the time of termination").

For the same reason, Rossetti's lack of disciplinary history during her eight-year tenure with SMP does not demonstrate pretext because it is entirely consistent with SMP's explanation that the problems with Rossetti's work performance only arose during the last three months of her employment.  Moreover, although Rossetti contends that, contrary to Rogers' testimony, he never counseled her about any purported misconduct during this time period, the absence of a warning under the circumstances of this case does not support a finding of pretext.  Despite her lack of any disciplinary history, the evidence establishes that Rogers was concerned about Rossetti's job performance prior to her hospitalization.  According to both Rogers and Wirth, Rogers asked Wirth to keep a log of Rossetti's work conduct prior to her hospitalization because he was concerned about her job performance.  See Rogers Aff. ¶¶ 13-14; Wirth Aff. ¶ 12.  Rossetti does not dispute that Rogers instructed Wirth to keep the Wirth Log, nor does she offer any other explanation for why he would have made this request.  Thus, "[w]hile the lack of complaints or disciplinary reports in an employee's personnel file may support a finding of pretext" in some cases, see Wascura v. City of S. Miami, 257 F.3d 1238, 1245 (11th

Cir. 2001), such an inference cannot be drawn here because the existence of the Wirth Log undercuts any argument that Rogers became concerned about Rossetti's work habits only after she was hospitalized. See Smith, 302 F.3d at 834 ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."). Moreover, given that Rogers did not learn the full extent of Rossetti's alleged misconduct until after she was on leave, he could not have previously warned her about misconduct of which he was unaware.[18]

Finally, Rossetti's argument that SMP failed to follow its progressive discipline policy is unavailing. Significantly, Rogers explained that he terminated Rossetti's position due to a downturn in the economy and the apparent lack of any need for a branch manager. Rossetti makes no effort to rebut that explanation and presents no evidence that a progressive discipline policy would apply under such circumstances. Nonetheless, even to the extent SMP's disciplinary policies are relevant, the evidence shows that management retained the discretion to "make all disciplinary decisions," "depending upon the frequency and the nature of offense." See Handbook at 53. Because Rogers had

---

[18]    Rossetti also appears to contend that SMP did not actually care if employees engaged in the misconduct for which it terminated her. Specifically, Rossetti testified that, despite the policies written in the Handbook, SMP did not care about "excessive personal telephone calls," use of the Internet for personal reasons or entertainment purposes during work hours, or receiving visitors at work. See Rossetti Dep. at 50-53. However, Rossetti fails to identify any other employee who engaged in similar conduct while at work and was not terminated or disciplined. And, because she categorically denies engaging in any misconduct, see Rossetti Aff. ¶ 9, she offers no evidence that Rogers was fully aware that these activities were taking place at work prior to her hospitalization and did not mind. Absent any "concrete evidence in the form of specific facts" establishing that SMP did not genuinely care if employees chatted on the phone, played on the internet, and received personal visitors during the workdays, Rossetti's "conclusory allegations and assertions" will not suffice. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990); see also Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332 (11th Cir. 1998) ("Such a naked assertion is not evidence of pretext, especially when the uncontroverted evidence suggests that the statement was in fact true.").

discretion as to the appropriate sanction for Rossetti's alleged misconduct, his failure to follow a progressive discipline policy is not evidence of pretext.  See Ritchie, 426 F. App'x at 873 ("[I]f management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext."); Gonzalez v. Fla. Dep't of Mgmt. Servs., 683 F. App'x 738, 744-45 (11th Cir. 2017) (per curiam) ("Because counseling and formal warnings were discretionary options, the Department's failure to provide them does not raise a genuine issue of fact as to whether its stated reasons for terminating Gonzalez were pretextual.").

        In sum, Rossetti has created only weak issues of fact disputing whether Rogers counseled her prior to her termination, whether she engaged in the misconduct reported to Rogers, and whether Rogers gave her permission to dye her hair at work in 2014. However, the Court finds this evidence insufficient to establish pretext given the unrebutted evidence that: (1) Rogers received complaints and had concerns about Rossetti's work habits prior to her need for FMLA leave, (2) after Rossetti was hospitalized, Rogers received additional reports from Wirth and Kelly that Rossetti was regularly engaged in egregious misconduct at work, of which he was previously unaware and which he corroborated, and (3) business had slowed in the Jacksonville office.  If Wirth and Kelly's reports to Rogers are indeed false, as Rossetti maintains, then it may be that her termination is unfair, but that does not make it retaliatory.  See Alvarez, 610 F.3d at 1266 ("The question to be resolved is not the wisdom or accuracy of [Rogers'] conclusion that [Rossetti's] performance was unsatisfactory, or whether the decision to fire her was 'prudent or fair.'").  Indeed, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long

as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Comm'ns, 738 F.2d 1181, 1187 (11th Cir. 1984). Thus, even viewing the evidence in the light most favorable to Rossetti, the Court is convinced that no reasonable juror could conclude that SMP terminated Rossetti for any reason other than the reports of her improper activities at work combined with the slow-down in business. See Schaaf, 602 F.3d at 1244 n.3 ("[E]ven if Schaaf has successfully cast some doubt on GSK's nondiscriminatory rationale, she did not show that the rationale was a pretext for discrimination.") (emphasis in the original); see also Gerard v. Bd. of Regents of Ga., 324 F. App'x 818, 826 (11th Cir. 2009) ("[S]ummary judgment is proper where the defendant offers legitimate reasons and the employee only offers temporal proximity." (citing Wascura, 257 F.3d at 1247 (11th Cir. 2001))). Accordingly, summary judgment is due to be entered in SMP's favor with respect to Rossetti's retaliation claim set forth in Count I of the Complaint.

**B. Interference (Count II)**

Next, the Court turns to Rossetti's claim that SMP interfered with her ability to exercise her rights under the FMLA. "To prove FMLA interference, an employee must demonstrate that [s]he was denied a benefit to which [s]he was entitled under the FMLA." Martin, 543 F.3d at 1266-67; see also Hurlbert, 439 F.3d at 1293 ("To establish an interference claim, 'an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied.'") (quotation omitted). Thus, to prevail on an interference claim, the employee must show that she "(1) was entitled to a benefit under the FMLA, and (2) her employer denied her that benefit." White v. Beltram Edge Tool Supply, Inc., 789 F.3d 1188, 1191 (11th Cir. 2015) (citing Krutzig, 602 F.3d at 1235). Additionally, the employee must show "that she 'has been prejudiced by the

violation in some way.'" <u>Evans v. Books-A-Million</u>, 762 F.3d 1288, 1295 (11th Cir. 2014) (citing <u>Ragsdale v. Wolverine World Wide, Inc.</u>, 535 U.S. 81, 89 (2002)). The employee does not have to prove "that [her] employer intended to deny the benefit, because 'the employer's motives are irrelevant.'" <u>Krutzig</u>, 602 F.3d at 1235 (quoting <u>Strickland</u>, 239 F.3d at 1208).

As relevant to this action, the FMLA requires employers to provide employees with several notices about the FMLA in order "to ensure that employers allow their employees to make informed decisions about leave." <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 144 (3d Cir. 2004) (quoting <u>Nusbaum v. CB Richard Ellis, Inc.</u>, 171 F. Supp. 2d 377, 385-86 (D.N.J. 2001)). Specifically, employers are required to post a general notice about the FMLA in the plain view of all employees at the workplace. 29 C.F.R. § 825.300(a). Additional duties are triggered "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason." 29 C.F.R. § 825.300(b)(1). "[W]ithin five business days" of acquiring such knowledge, "absent extenuating circumstances," the employer "must notify the employee of [her] eligibility to take FMLA leave" and her rights and responsibilities under the FMLA. <u>Id.</u> § 825.300(b), (c). Additionally, within five business days of acquiring "enough information to determine whether the leave is being taken for a FMLA-qualifying reason . . ., the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave . . . ." <u>Id.</u> § 825.300(d). An employer's failure to satisfy these notice requirements "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." <u>Id.</u> § 825.300(e).

Although the precise theory of relief on which Rossetti brings her interference claim is unclear, to the extent Rossetti argues that SMP's termination of her employment interfered with her right to reinstatement, or her right to commence intermittent FMLA leave, her claim fails. "An employee has the right following FMLA leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an equivalent position." See Martin, 543 F.3d at 1267 (quoting 29 U.S.C. § 2614(a)(1)(A)). However, "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed with the company during the FMLA leave period." Parris v. Miami Herald Pub'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000) (citing 29 C.F.R. § 825.216(a)). Thus, "an employer can deny reinstatement 'if it can demonstrate that it would have discharged the employee had [she] not been on FMLA leave.'" Martin, 543 F.3d at 1267 (quoting Strickland, 239 F.3d at 1208). Likewise, "the right to commence FMLA leave is not absolute, and [ ] an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." Krutzig, 602 F.3d at 1236 (emphasis added).

When an employee asserts a denial of her right to commence FMLA leave or to reinstatement, "the crux of the issue is whether [the employer] terminated [the employee] for reasons unrelated to her request for FMLA leave." Benz, 732 F. App'x at 804; Krutzig, 602 F.3d at 1236. Significantly, it is the employer's burden to show "that it refused to reinstate the employee to her former position for a reason wholly unrelated to the FMLA leave . . . ." See Jones v. Aaron's Inc., __ F. App'x __, 2018 WL 4203459, at *10 (11th

Cir. Sept. 4, 2018); Schaaf, 602 F.3d at 1241. Here, SMP presents evidence that it terminated Rossetti for reasons unrelated to her FMLA leave, specifically, that Rossetti would have been terminated regardless of her leave due to the egregious misconduct reported by her workmates and the downturn in the economy.[19] And, as discussed above, Rossetti fails to present any evidence rebutting SMP's legitimate explanation for her termination. See Bartels, 681 F. App'x at 840 ("[I]t is not improper burden shifting for the district court to consider the employee's inability to show pretext in relation to his retaliation claim in determining, for purposes of the interference claim, that the employer still would have terminated the employee for a reason unrelated to the FMLA."). Accordingly, as SMP has established the absence of any genuine dispute that Rossetti's misconduct and the economy, not Rossetti's need for FMLA leave, were the cause of her termination, Rossetti's claim for interference on this basis is unavailing. See Han v. Emory Univ., 658 F. App'x 543, 547 (11th Cir. 2016) (per curiam) ("As Emory's reasons for terminating Han were unrelated to her leave, her claim that the termination constituted interference is unfounded and not supported by law.").

Despite this, Rossetti contends that SMP's "failure to advise [her] of her FMLA rights after she properly gave notice" gives rise to an interference claim under the FMLA as well. See Response at 3. Notably, SMP appears to concede that it failed to comply

---

[19]     Notably, the fact that Wirth and Kelly used Rossetti's absence to reveal the full extent of her misconduct does not mean that her leave was the cause of her termination within the meaning of the FMLA. See Schaaf, 602 F.3d at 1242 (explaining that in such a circumstance the employer was "motivated not by the taking of the leave itself, but rather by prior deficiencies that, whenever they were discovered, would have prompted . . . discharge whether or not the employee took FMLA leave"); see also Kohls v. Beverly Enters. Wis., Inc., 259 F.3d 799, 806 (7th Cir. 2001) ("The fact that the leave permitted the employer to discover the problems can not logically be a bar to the employer's ability to fire the deficient employee."); Wu, 321 F. Supp. 2d at 1341 ("[T]he fact that the plaintiff's leave is what permitted [the employer] to discover the problems with plaintiff's work performance is of no consequence. Although one could say that plaintiff might not have been demoted if he had not taken leave (at least not at that time), the leave was not the proximate cause of the demotion.").

with the FMLA's notice requirements.  <u>See</u> Response at 14.  Rossetti's claim still fails.

While Rossetti is correct that a failure to provide the requisite FMLA notice can form the

basis of an interference claim, to prevail on such a claim, Rossetti must establish that she

suffered prejudice as a result of SMP's failure to provide notice.  <u>See</u> <u>Conoshenti</u>, 364

F.3d at 143; <u>Sarno v. Douglas Elliman-Gibbons & Ives, Inc.</u>, 183 F.3d 155, 162 (2d Cir.

1999) (declining to "interpret the FMLA as giving an employee the right to sue the

employer for failing to give notice of the terms of the Act where the lack of notice had no

effect on the employee's exercise of or attempt to exercise any substantive right conferred

by the act"); <u>see also</u> <u>Ragsdale</u>, 535 U.S. at 89 (explaining that the FMLA provides relief

for an employer's interference with an employee's FMLA rights only where "the employee

has been prejudiced by the violation"); <u>Evans</u>, 762 F.3d at 1295 (instructing that to prove

a claim for interference, a plaintiff must show that she was prejudiced by the violation in

some way); <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1284 (11th Cir. 1999)

("Even if the defendants have committed certain technical infractions under the FMLA,

plaintiff may not recover in the absence of damages.").  Indeed, a review of the cases

Rossetti herself relies on in her Response reflects the need to show prejudice.  In these

cases, the employees who were terminated after taking too much leave had viable

interference claims based on a lack of notice because, had they been informed of their

rights, they could have structured their leave differently to preserve their employment.

<u>See</u> <u>Conoshenti</u>, 364 F.3d at 142-46 (finding issue of fact regarding whether employee

was prejudiced by lack of notice where employee was terminated for extended absence

from work and argued that he could have structured his leave differently had he known

FMLA leave was limited to twelve weeks); <u>Young v. Wackenhut Corp.</u>, No. 10-2608

(DMC)(JAD), 2013 WL 435971 (D.N.J. Feb. 1, 2013) (finding employee was prejudiced by her employer's failure to provide her with proper FMLA notice because had the employee "been appropriately apprised of her leave time, [she] could have planned and structured her leave time differently," and thereby prevented her discharge).[20]

Rossetti appears to believe that had SMP notified her of her FMLA rights while she was hospitalized, she could have invoked those rights and prevented her termination. See Response at 10-12. However, unlike the cases on which Rossetti relies, SMP terminated Rossetti for reasons unrelated to her leave. Thus, even if SMP had notified Rossetti of her FMLA rights, she could not have made any "informed decision" to invoke her rights, restructure her leave, or otherwise prevent her discharge. See Vannoy v. Fed. Reserve Bank of Richmond, 827 F.3d 296, 302 (4th Cir. 2016) ("Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding [her] FMLA rights, [s]he would have structured [her] leave differently."); Caplan v. L Brands/Victoria's Secret Stores, LLC, 210 F. Supp. 3d 744, 758 (W.D. Pa. 2016) ("While Caplan makes the blanket assertion that if properly informed about her FMLA rights 'she would have structured her leave differently so that her job would have been protected,' she does not state how she would have structured the leave, or how that restructuring would have protected her job."). Rossetti received all the leave she might have requested, and then, after she was cleared to return to work, she was

---

[20]   Rossetti also cites Brunson v. Forest Preserve Dist. of Cook Cnty., No. 08 C 2200, 2010 WL 780331 (N.D. Ill. Mar. 3, 2010) which has no apparent relevance to her lack of notice argument or the facts of this case. See Response at 11. In Brunson, the plaintiff alleged that her employer interfered with her FMLA rights by failing to respond to her request for FMLA leave and terminating her employment. See Brunson, 2010 WL 780331, at *4. The court addressed whether the plaintiff had a "serious health condition," whether the statute of limitations had expired, and whether the individual defendants were protected by qualified immunity. Id. None of these issues are presently before the Court.

terminated for reasons unrelated to her leave. Absent any evidence that she was damaged by SMP's failure to provide FMLA notice, her interference claim on this basis also fails.[21] Accordingly, the Court concludes that SMP's Motion is due to be granted in its entirety. In light of the foregoing, it is

**ORDERED**:

1. Defendant the Rose Group, Inc. d/b/a Suwannee Medical Personnel's Motion for Summary Judgment and Memorandum of Law (Doc. 19) is **GRANTED**.

2. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant The Rose Group, Inc. d/b/a Suwannee Medical Personnel and against Plaintiff Laura Rossetti.

3. The Clerk of the Court is further directed to terminate all remaining pending motions, terminate all deadlines, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida on November 27, 2018.

MARCIA MORALES HOWARD
United States District Judge

---

[21] To the extent Rossetti argues that she suffered prejudice because without notice of her FMLA rights, she "used her [paid time off] to cover her leave," this contention is without merit. See Response at 10. Notably, Rossetti cites no authority in support of her proposition that an employer's decision to place an employee on paid leave, rather than unpaid FMLA leave, constitutes prejudice. Rather, "[an] FMLA interference claim based solely on her leave status requires [Rossetti] to show that she was denied benefits because she was not on FMLA leave." See Rodriguez v. School Bd. of Hillsborough Cnty., Fla., 60 F. Supp. 3d 1273, 1279 (M.D. Fla. 2014) (citing Graham, 193 F.3d at 1284). Significantly, Rossetti does not argue, and there is no evidence to suggest, that she was denied any benefit because she was on paid time off, rather than FMLA leave, during her hospitalization. Indeed, according to Rogers, he "was not counting [Rossetti's] absences against her, . . . [her] attendance record would in no way reflect that [she] had been absent during her hospitalization." See Rogers Aff. ¶ 16. Accordingly, the Court finds that SMP's decision to place Rossetti on paid leave while she was in the hospital was not prejudicial to Rossetti. See Rodriguez, 60 F. Supp. 3d at 1279; Lopez v. City of West Miami, No. 1:14-cv-23293-UU, 2015 WL 12978166, at *8 (S.D. Fla. Sept. 16, 2015) (finding that even if employer technically violated the FMLA by failing to process application, plaintiff suffered no damages where she was placed on paid administrative leave, which is more generous than FMLA leave). To the extent Rossetti contends that she was denied the benefit of reinstatement because she was on paid leave, rather than FMLA leave, this argument is without merit because, as discussed above, her termination was not related to her leave.

lc25/lc11
Copies to:
Counsel of Record